UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>ALLVEST CORPORATION, d/b/a<br>ALLVEST, INC.<br><br>           Debtor. | Case No. 3:06-cv-00044-TMB<br><br>MEMORANDUM DECISION |
| EVELYN BROWN, Trustee of the<br>Estate of Wassillie William Alexie,<br><br>           Appellant,<br><br>           vs.<br><br>J.W.; B.P.; K.S.; C.W.; A.W.; and<br>KENNETH W. BATTLEY, Trustee,[1]<br><br>           Appellees. | On Appeal From<br>U.S. Bankruptcy Court, District of Alaska<br>Hon. Donald MacDonald IV, Chief Judge<br>Bankruptcy Case No. A02-01042-DMD |

    Evelyn Brown ("Brown") appeals from the judgment of the bankruptcy court that her claim against the receiver of Classic Marine & Fire Insurance Company was an asset of the bankruptcy estate.

    This matter was argued and submitted July 21, 2006. The Court having reviewed the briefs and record on appeal and considered the arguments of the parties made at oral argument affirms the judgment of the bankruptcy court.

### I. BACKGROUND/JURISDICTION

    On October 3, 2002, an involuntary bankruptcy petition under chapter 11 of the Bankruptcy Code was filed against Allvest Corporation. This petition was unopposed and an order for relief entered. Upon the motion of Allvest, the case was converted to a

---

[1] K.W. Battley, the trustee of the bankruptcy estate has not appeared; included for notice purposes only.

case under chapter 7 of the Bankruptcy Code and Kenneth W. Battley appointed case trustee.

Prior to the filing of the bankruptcy petition Brown and the appellees J.W., B.P., K.S., C.W., and K.W. ("J.W. creditors") had obtained judgments against Allvest. Allvest's insurer was insolvent and the judgments remained unsatisfied. Brown and the J.W. creditors had claims against the receiver of the insolvent insurer as well as other third parties pending, which actions were removed to the bankruptcy court. These actions were resolved by a Settlement Agreement approved by the bankruptcy court.

Thereafter a dispute arose as to the scope of the Settlement Agreement. Brown filed a motion requesting the bankruptcy court determine that certain proceeds from the insurance policy were not property of the bankruptcy estate. The J.W. creditors filed a cross-motion seeking a determination that the proceeds were property of the bankruptcy estate. The bankruptcy court entered its Memorandum Decision and Judgment on January 12, 2006, denying Brown's motion and granting the motion of the J.W. creditors. Brown timely filed a notice of appeal on January 18, 2006; on January 27, 2006, the J.W. creditors timely filed an objection to the reference to the Bankruptcy Appellate Panel for the Ninth Circuit.

This Court has jurisdiction under 28 U.S.C. §158(a)(1), (c)(1)(A).

## II. ISSUE PRESENTED/STANDARD OF REVIEW

The bankruptcy court held that Brown's claim did not become part of the bankruptcy estate by operation of law but did pass to the bankruptcy estate as a result of the Settlement Agreement. The issue as presented by Brown is: Did the Settlement Agreement reached by the parties and approved by the bankruptcy court transfer Brown's claim against the receiver for the insurance company to the bankruptcy estate?

On an appeal to the district court from the bankruptcy court the standard of review is clearly erroneous for factual questions and *de novo* for legal questions and mixed questions of fact and law.[2] A factual finding is 'clearly erroneous' when a reviewing court "is left with the definite and firm conviction that a mistake has been

---

[2] *See Murray v. Bammer* (*In re Bammer*), 131 F.3d 788, 792 (9th Cir. 1997) (en banc).

committed."[3] As long as the bankruptcy court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if this Court, as the reviewing court, would have weighed the evidence differently had it sat as the trier of fact.[4] However, the standard of review for contractual matters is not always clear cut. In general, factual findings as to what the parties did or said are reviewed under the clearly erroneous standard while the principles of contract interpretation are reviewed *de novo*.[5] When the trial court interprets a contract without using extrinsic evidence, the standard of review is *de novo*.[6] The interpretation of a settlement agreement is governed by principles of state contract law,[7] which this Court also reviews *de novo*.[8]

### III. FACTS[9]

William Weimar was a successful businessman in Alaska. Among other activities, his corporation, Allvest, Inc., provided services to the Municipality of Anchorage for a "Community Service Patrol." The patrol was utilized to remove intoxicated people from the streets of Anchorage and place them in a safe environment until they were sober. Alexie was injured by employees of Allvest in July of 1995 and died as a result of his injuries. The following year the J.W. creditors were also injured as a result of actions by Allvest employees. The injuries to the J.W. creditors occurred between October 1, 1995, and June 1, 1996. Both Brown, as trustee of the Alexie estate, and the J.W. creditors sued Allvest in 1997. The J.W. creditors received a judgment for $58,090 in compensatory damages and $1,000,000 punitive damages in

---

[3] *Easley v. Cromartie,* 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 (1948)); *Minidoka Irrigation Dist. v. Department of Interior, U.S.*, 406 F.3d 567, 572 (9th Cir.2005).

[4] *SEC v. Rubera,* 350 F.3d 1084, 1093-94 (9th Cir.2003)

[5] *L.K. Comstock & Co., Inc. v. United Eng'rs & Constructors, Inc.*, 880 F.2d 219, 221 (9th Cir.1989).

[6] *Id.*

[7] *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir.1993).

[8] *El-Hakem v. BJY Inc.,* 415 F.3d 1068, 1072 (9th Cir.2005).

[9] Adapted from the Memorandum Decision entered by the bankruptcy court. [Reported at 8 ABR 193 (2006).]

April 2002. Brown obtained a judgment for over $1,000,000 in compensatory damages and $2,000,000 punitive damages in July 2001. Neither of the judgments were paid by Allvest's insurer, Classic Fire and Marine, which was in liquidation. Brown and the J.W creditors filed claims against Classic in its liquidation proceeding before the bankruptcy case commenced.

Allvest purchased a $1 million liability insurance policy from Classic Fire and Marine Insurance covering the period from August 1, 1994, through July 31, 1995. Alexie's injuries occurred while this policy was in effect. Allvest purchased a $2 million liability insurance policy from Classic to cover the period from August 1, 1995, through July 31, 1996. All of the J.W. creditors' injuries occurred during this second policy period. Accordingly, the claims of Brown and the J.W. creditors are each being asserted against separate policies issued to Allvest by Classic.[10]

Weimar sold the assets of Allvest for $20 million in 1998 and began a series of asset transfers to separate corporations and trusts. After the J.W. creditors and Brown had obtained their state court judgments against Allvest, each filed supplemental complaints in aid of execution in their respective state court actions. The supplemental complaints were against Weimar and other non-debtor entities, and sought to recover the Allvest assets on fraudulent transfer, alter ego and other grounds.

In May 2002 the J.W. creditors seized $490,854 from Allvest. Brown filed an involuntary chapter 11 bankruptcy petition against Allvest in October 2002. Weimar removed the state court actions of both Brown and the J.W. creditors to the bankruptcy court. The J.W. creditors responded by seeking relief from stay and remand of their action to state court. Oppositions to the J.W. creditors' motions were filed by the trustee, Weimar, and several other parties who had been named as defendants in the supplemental complaint. After a hearing on the J.W. creditors' motions the bankruptcy court set a briefing schedule for further responses.

---

[10] The J.W. creditors' insurance claim was not at issue before the bankruptcy court because the trustee sold this claim back to the J.W. creditors, after having decided not to contest the insurance liquidator's valuation of that claim. Memorandum Decision, p. 4, n.1.

MEMORANDUM DECISION
*In re Allvest Corp.*, 3:06-cv-00044-TMB            4

No final order was entered with regard to the J.W. creditors' two motions. Instead, as 2002 drew to a close, Weimar, the trustee, Brown, and the J.W. creditors started negotiations for a settlement. Weimar and the other entities being sued wished to end the litigation, which had become contentious. Additionally, Weimar would receive substantial tax advantages if a settlement could be reached before year end. The parties presented a hastily drafted Settlement Agreement to the court for approval on December 31, 2002. This agreement was approved by the bankruptcy court after a lengthy hearing and some last minute modifications.

The parties disagreed on the meaning of the Settlement Agreement. The J.W. creditors contended that the claim asserted by Brown against Allvest's insurance liquidator on account of her state court judgment became property of the bankruptcy estate by virtue of the Settlement Agreement. The trustee also contended that Brown's claim belonged to the estate, but by operation of law rather than through the Settlement Agreement. Brown insisted that the claim was, and has remained, her separate property. The two issues presented to the bankruptcy court to be determined were: (1) whether Brown's insurance claim belonged to the bankruptcy estate by operation of law; and (2) whether the insurance claim came into the bankruptcy estate as part of the Settlement Agreement. The bankruptcy court held that the proceeds did not become part of the bankruptcy estate by operation of law but that the proceeds did become part of the estate via the Settlement Agreement.

## IV. DISCUSSION

The J.W. creditors contend the insurance claims became part of the bankruptcy estate under the terms of the Settlement Agreement, particularly ¶ 10, which provides:[11/]

> 10. The Trustee will retain any insurance claims with respect to any insurance given in favor of Allvest as insured (or insurance of any nature may [*sic*] apply to underlying claims by J.W. et al. and by Brown for the existing judgments held by these parties) and any claims associated with such insurance including claims against brokers, excess line carriers, receivers, or claims in insolvency proceedings for any insurance company.

---

[11/] Ex. A to Judgment Approving Settlement Agreement, entered Dec. 31, 2002, at pp. 5-6 [Record Docket No. 73].

> Weimar, the Weimar entities, and the Released Parties will cooperate in Trustee's efforts to make recovery on insurance and insurance-related claims. There shall be no director or officer claims. Weimer shall represent in his affidavit that to the best of his recollection and good faith there is no director and officer insurance policy.

Brown disagrees with the creditors' interpretation relying heavily on the meaning of the word "retain" and the lack of any evidence that she assigned her claim to the estate.

The bankruptcy court held that the Settlement Agreement was a fully integrated document, a finding that is not challenged on the appeal to this Court. Correctly applying Alaska law,[12] the bankruptcy court examined the entire agreement as well as extrinsic evidence to ascertain its meaning. In a well reasoned decision the bankruptcy court concluded that the Settlement Agreement was intended to and does encompass Brown's claim against the receiver to the bankruptcy estate.[13]

> Having concluded that the settlement agreement is an integrated agreement, the next step is to determine its meaning. Brown argues that the insurance claims were never discussed when the agreement was negotiated, so there is no way she could have assigned her interest to the trustee. She also argues, as noted above, that paragraph 10 of the agreement could not be interpreted to encompass her insurance claim, because the trustee can't "retain" an interest which he doesn't already hold. I find this argument unpersuasive because the trustee believed, at the time the agreement was negotiated, that he held the insurance claims by operation of law. Moreover, paragraph 10 of the agreement specifies that the trustee will retain "any insurance claims with respect to any insurance given in favor of Allvest as insured (or insurance of any nature may [sic] apply to underlying claims by J.W. et. al. and by Brown for the existing judgments held by these parties)." This is extremely broad language which expressly encompasses the insurance applying to Brown's claim, based upon the judgment held by her. The agreement says that the trustee will retain all insurance claims, including Brown's.
>
> Another provision in the settlement agreement supports this interpretation. Paragraph 17, which was handwritten on the document during the course of the hearing on approval of the agreement, states:

---

[12] *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.,* 778 P.2d 581, 584 (Alaska 1989); *see also Sourdough Dev. Services, Inc. v. Riley*, 85 P.3d 463, 468 (Alaska 2004).

[13] Memorandum Decision, pp. 13–18 (footnotes omitted).

> 17. The distribution of estate assets on account of general unsecured claims of J.W., et al. and Evelyn Brown shall be as follows: 47% J.W. et al and 53% Brown until J.W. et al have received total payments equal to the balance of principal and interest owed on the J.W. et al judgments against Debtor as of the petition date (approx. 1.4 million). Thereafter Brown will receive 100% of all subsequent distributions on account of unsecured claims.

There is no provision in this paragraph for the J.W. creditors or Brown to offset any insurance proceeds ultimately disbursed from Classic's liquidator against their claims in the bankruptcy case. If the parties had not intended for these insurance claims to come into the estate, there should have been a provision in the agreement for either a credit or setoff of insurance recoveries against the funds to be disbursed to these two creditors from the bankruptcy estate. There wasn't, however, because the insurance proceeds were to come into the estate, along with the assets contributed by Weimar and the portion of the levied funds held in the J.W. creditors' state court proceeding. Both Brown and the J.W. creditors would look exclusively to the bankruptcy estate for payment of their claims, under the formula specified in paragraph 17.

     Brown contends she never would have agreed to the 47/53% split if she had understood that the trustee intended to administer her insurance claim. She points out that, if the distribution formula contained in 11 U.S.C. § 726 were used instead, the J.W. creditors' large punitive damage claim would have been subordinated to her compensatory damage claim, resulting in the J.W. creditors receiving only $58,090 plus costs and Brown receiving the remainder of any funds disbursed by the trustee until her compensatory claim of more than $1 million had been paid in full. If this is so, why did Brown agree to the split in the first place, unless she was also compromising her interest, as had the J.W. creditors by releasing funds that they had seized in state court levies, in order to induce Weimar and his related entities to enter into a global settlement? Her argument is not persuasive.

     The settlement agreement says all insurance claims, including the tort claims held by the J.W. creditors and Brown, would be administered by the trustee. The weight of the extrinsic evidence produced by the parties supports this conclusion. Prior to the hearing on approval of the settlement agreement, the parties held several meetings. Attorneys representing Brown, the J.W. creditors, the trustee and Weimar were present at those meetings. Trustee Kenneth Battley prepared a term sheet that listed insurance claims with a value of $440,000 as an asset of the estate. Battley also included $487,000 of cash seized by the J.W. creditors as an asset of the estate. This sheet was distributed to attorney Don

Bauermeister, who represented Brown, and Brett von Gemmingen, who represented the J.W. creditors, during the course of the negotiations. There were apparently no specific discussions about what comprised the $440,000 in insurance claims listed on the trustee's term sheet. Bauermeister says it was his understanding that this figure represented any claims belonging to Weimar or the Weimar entities, which would be assigned to the trustee. He didn't believe the figure included Brown's insurance claim, noting that Brown's claim alone at that time was worth in excess of $3.3 million, and that he had filed a claim on Brown's behalf with the liquidator for in excess of $10 million. But, during the negotiations, he didn't clarify what was encompassed in the trustee's $440,000 estimate. The attorneys participating in the settlement negotiations made no comments relative to the estate's administration of the insurance claims. This lack of discussion does not provide a rationale for voiding the clear meaning of paragraph 10 of the settlement agreement.

John Seimers, attorney for the trustee, filed a motion to approve the settlement agreement on December 31, 2002. He had served the attorneys for Brown and the J.W. creditors with this motion via fax the previous day, on December 30, 2002. The motion reflects that the trustee anticipated administering significant insurance claims. It stated, at page 2:

> The settlement is fairly simple. William Weimar has agreed to pay in full all creditor claims of the bankruptcy estate for Allvest, Inc. except for the judgment creditor claims of J.W., et al. and the judgment creditor claims of Evelyn Brown. These two groups of judgment creditors will be the only creditors remaining in the estate once the settlement has been approved and consummated. The settlement requires Weimar to transfer assets (as described below) which will create a value to the estate of approximately $2.7 to $2.8 million. The aggregate value of the estate may actually exceed that amount if the trustee is successful in asserting additional insurance claims against insurers of Allvest, excess carriers, insurance brokers, and the like arising out of the tort claims originally asserted by J.W., et al., and by Evelyn Brown. One or more of Allvest's insurers is insolvent, but it is believed that in the insolvency proceedings, a dividend of 80% is possible and that a recovery to the estate might occur in the amount of $400,000 or more on a net basis. However, at present, these insurance claims are contingent and have not yet been realized.

Later, at pages 4 through 6, the motion stated:

> In addition to the foregoing, Weimar will pay all prepetition unsecured creditors in this case other than J.W., et al. and Evelyn Brown. J.W., et al. and Brown will be the only prepetition creditors remaining. J.W., et al. and Evelyn Brown have in turn entered into an agreement *inter se* with respect to the distribution of assets in the Allvest case to creditors holding pre-petition unsecured claims. The total amount of the J.W., et al. claim as of the petition date is approximately $1.4 million. The total amount of the Evelyn Brown claim as of the petition date is in the neighborhood of $3.7 to 3.8 million. Because of an agreement that has been entered into between J.W., et al. and Brown, the normal pro rata distributions between those two creditors will be adjusted in a manner which favors J.W., et al., and Brown has also agreed to reduce Brown's total claim against the estate. The details of that arrangement will be separately disclosed. J.W., et al. and Brown have indicated that in light of this settlement *inter se*, they will agree to provide a release to Weimar, Weimar entities, and a variety of Weimar professionals and associates, as discussed below.
>
> . . . .
>
> The bankruptcy estate will retain whatever interest Allvest, Inc. had in any right to indemnification or other recovery from any insurance company with respect to the tort claims asserted by J.W., et al. and by Brown. This will include any related insurance claims, such as claims against the receiver in any insolvency proceedings for any such carriers, claims against brokers, claims against surplus line carriers, and so on. This will preserve to the estate the possibility of an additional recovery beyond the assets being transferred by Weimar to the estate.

At the time the settlement was negotiated, the trustee believed the insurance claims of Brown and the J.W. creditors belonged to the bankruptcy estate as a matter of law. He has acted consistently with this belief since the settlement was approved. The J.W. creditors have also proceeded on the assumption that the insurance claims were to be administered by the trustee, but on the basis of the settlement agreement. The conduct of these two parties is consistent with the provisions of paragraph 10 of the settlement agreement.

I conclude that the contract meant what it said and that Brown has failed to provide compelling extrinsic evidence justifying her view of the

contract. As this court has determined the meaning of the contract, Brown is precluded from enforcing any contrary or inconsistent agreements.

Brown argues that decision of the bankruptcy court "was erroneous in light of the plain meaning of the operative word 'retain' and the unanimous testimony of the drafters of the Settlement Agreement that it was not intended that Brown's claim would come into the estate through the Settlement Agreement." Brown further argues that this Court must review the conclusion of the bankruptcy court *de novo*.

Where, as here, the bankruptcy court resorted to extrinsic evidence (even Brown relies on extrinsic evidence as supporting her interpretation[14]), the interpretation of the Settlement Agreement by the bankruptcy court must be upheld unless "clearly erroneous."[15] Applying this deferential standard, this Court can not find that the interpretation of the Settlement Agreement by the bankruptcy court was clearly erroneous.

In the Trustee's motion to approve the Settlement Agreement it was clearly indicated the claims against the insurer arising out of the judgments obtained by both the J.W. creditors and Brown were included in the bankruptcy estate. At oral argument Brown conceded that no objection was raised to the trustee's motion to approve the Settlement Agreement. From this, the logical inference to be drawn is that Brown acquiesced in the Trustee's construction. Whatever the reason or the basis for it, it may be reasonably inferred that the intent of the parties at the time the Settlement Agreement was reached was that the claims against the receiver, including the Brown claim, were included in the "pot" retained as part of the bankruptcy estate to be distributed to the J.W. creditors and Brown in the agreed ratio.

---

[14] The evidence relied on by Brown is principally the testimony of the attorney for the trustee (that there was no assignment of the Brown claim against the receiver to the estate, nor any discussion of such an assignment), the attorney for Weimar (same), and the attorney for Brown (that no request for an assignment was made). While this testimony is consistent with the Settlement Agreement that there was no *assignment* of the claims, it is not necessarily probative, and certainly not dispositive, of the issue: did the parties intend the claims against the receiver *to be included* as part of the bankruptcy estate.

[15] *Tamen v. Alhambra World Investment, Inc. (In re Tamen)*, 22 F.3d 199, 203 (9th Cir.1994)

Brown argues that it is counterintuitive to assume that she would agree to her claim being included in the pot, particularly since she agreed to a less favorable distribution. Brown reasons that even though she receives a larger percentage (53/47) and the normal distribution is equal, since her compensatory claim (>$1,000,000) was considerably larger than that of the J.W. creditors ($58,000), in the absence of her agreement to take a lesser amount she would receive a larger percentage of the estate.[16] The J.W. creditors point out in response that they contributed to the "pot" a substantial sum of money ($487,000) that they had seized prior to the bankruptcy filing, to which Brown responds the J.W. Creditors would have been required to return it in any event.[17] Also, as the J.W. creditors argue and the bankruptcy court noted, there was no provision for a set-off for any proceeds that may be received from the liquidation of the insurer. In addition, as the bankruptcy court also noted, the Trustee and J.W. creditors have acted consistently with the belief that the claims against the receiver were included in the estate, which is probative of the meaning,[18] and, until the motions the subject of this appeal were brought, Brown never indicated any disagreement with that construction.

What is clear from the record is that at the time the Settlement Agreement was made there were significant unresolved issues including the viability and value of various claims, including the claims against Weimar and the insurer's receiver. The Settlement Agreement was a global agreement intended to resolve these various claims and disputes as to whom was entitled to what. The parties may have been mistaken in what is logically inferred from the conduct of the parties at the time the agreement was

---

[16] The balance of the Brown and J.W. creditors claims were for punitive damages. Under the distribution scheme of the Bankruptcy Code, compensatory damages are paid in full before distributions are made to the holders of claims for punitive damages. *See* 11 U.S.C. § 726(a) (compensatory damages are in the second tier and punitive damages the fourth tier for distribution).

[17] The basis for Brown's position is unclear from the record. The funds appear to have been seized in May and the bankruptcy petition filed in October. This would put the cash seized outside the 90-day preference period. 11 U.S.C. § 547(b)(4)(A).

[18] *Peterson v. Wirum*, 625 P.2d 866, 870 n. 7 (Alaska 1981).

MEMORANDUM DECISION
*In re Allvest Corp.*, 3:06-cv-00044-TMB          11

Case 3:06-cv-00044-TMB   Document 25   Filed 07/31/06   Page 11 of 12

reached—a mutual understanding that the claims against the receiver belonged to the bankruptcy estate by operation of law. The existence of a mutual mistake of fact or law may, in appropriate circumstances, be grounds for reformation of a contract to reflect the true intent of the parties;[19] which is the relief Brown really seeks, *i.e.*, exclusion of her claim from the bankruptcy estate. However, the elements of reformation must be supported by clear and convincing evidence.[20] With respect to intent of the parties concerning the disposition of her claim against the receiver, the evidence produced by Brown does not satisfy that standard. The parties may have been mistaken that the claim was already part of the bankruptcy estate but that does not establish a mistake as to the *intent* of the parties that it be included.[21]

It may very well also be an "imperfect agreement"; however, the Court is not convinced that the determination of the bankruptcy court was erroneous, let alone clearly erroneous.

## V. CONCLUSION

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.

Dated: July 31, 2006

                                        s/ Timothy M. Burgess
                                        TIMOTHY M. BURGESS
                                        United States District Judge

---

[19] *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995).

[20] *Adams v. Adams*, 89 P.3d 743, 752 (Alaska 2004).

[21] Indeed, because the parties were mutually mistaken in the status of the claims against the receiver, if reformation were appropriate or necessary, the reverse would likely be the result: the Settlement Agreement reformed to require an assignment of the Brown claim to the Trustee, which was the true intent of the parties. *Cf. Voss*, 907 P.2d at 469.